In re ANTIOCH UNIVERSITY et al.[1]

Nos. 80–230 to 80–236.

District of Columbia Court of Appeals.

Argued April 18, 1980.

Decided July 9, 1980.

---

1. In view of the trial court ruling dismissing the law school from this action, the University's motion to dismiss the Antioch School of Law from the caption of this appeal is *granted*.

J. Alan Galbraith, Washington, D. C., with whom Terrence O'Donnell, Washington, D. C., was on brief, for Antioch University. David N. Webster, Washington, D. C., also entered an appearance.

William T. Coleman, Jr., Washington, D. C., with whom Richard C. Warmer, Ben E. Benjamin and John W. Karr, Washington, D. C., were on brief, for Edgar S. Cahn and Jean Camper Cahn, Co-deans, in their representative capacity for Antioch School of Law, et al.

Elkanah J. Burns, Washington, D. C., for Theresa Felton, et al.

Mark A. Venuti, pro se. Richard Erlich, pro se, and Philbert Davenport pro se, also entered appearances.

Before NEBEKER, HARRIS and PRYOR, Associate Judges.

NEBEKER, Associate Judge:

This case involves the denial of a preliminary injunction to the plaintiffs in a suit filed in the Superior Court and a partial granting of the defendant's motion for preliminary injunctive relief. Having examined the trial court's findings and conclusions of law in light of the issues presented, we affirm.

## I. BACKGROUND

This case arises from a dispute between Antioch University [hereinafter University] and one of its "units," the law school, concerning the control and spending of certain funds. Because of asserted University financial problems, the law school authorities fear that its existence as an accredited institution is threatened if funds paid by its students and grants for education and clinic programs are not administered by the law school officers. The University urges that its accountability as a trustee of all University funds and its ability to administer such funds for the welfare of the entire institution will be severely impaired unless its proper officers have full and unilateral control over all funds coming into the University. This dispute mushroomed into a claim by the Cahns, co-deans of the law school, that the University had contractually relinquished its control over the fiscal and administrative affairs of the law school and that the University was in breach of its fiduciary duties to the students of the law school and clients of its clinic. The University counters that the co-deans of the law school breached their fiduciary obligations to the University by refusing to follow its direction in the handling of the funds. Reasoning that the University could not employ officers who ignored their duties, the University dismissed the co-deans from their posts. Due to the many motions filed by parties to this action, we will detail rather extensively the procedural posture of the case.

The events leading to the trial court hearing on the preliminary injunction motions were as follows. On November 13, 1979, Edgar S. Cahn and Jean Camper Cahn, the co-deans of the law school at that time, filed on behalf of the law school and its constituent parts a complaint seeking declaratory and injunctive relief naming as defendants Antioch University and its president, William M. Birenbaum.[2] The complaint was accompanied by an application for a temporary restraining order and a motion for a preliminary injunction. A temporary restraining order was granted on November 13, 1979, modified on November 23, 1979, and extended on December 18, 1979. It required that (1) the University withdraw its notice to banks holding law school funds (these notices, based on D.C. Code 1973, § 21–1701 et seq., had revoked the authority of all persons at the law school to dispose of the funds); (2) the University not interfere with the financial and administrative affairs of the law school as conducted prior to November 8, 1979 (the time prior to the University's revocation of the authority of the co-deans to draw on the law school bank accounts) pending a hearing on the motion for preliminary injunction; and (3) the law school expend the funds on deposit for the law school solely for the direct and routine expenses of the law school. This temporary restraining order was modified to require (1) the co-deans to post a personal $20,000 bond; (2) the law school to provide University officials and the Court with a daily report of expenditures made from these funds; and (3) the law school to furnish the University with a detailed statement of the current status of certain law school accounts.

Prior to the hearing on the motion for a preliminary injunction, the University filed several motions, as well as its own cross-motion for a preliminary injunction. These matters were considered together. Immediately prior to commencement of this hearing, motions for intervention as of right as plaintiffs, pursuant to Super.Ct.Civ.R. 24(a),[3] were filed on behalf of members of the faculty, staff, students and clients of the law school [hereinafter intervenors]. The University opposed, but intervention as to all was granted.[4]

The hearing on all pending motions commenced November 21, 1979, and was concluded December 14, 1979. Nineteen witnesses testified and 190 exhibits were admitted into evidence. The transcript of this proceeding consists of 3,178 pages. On December 28, 1979, the co-deans filed two additional motions. They first sought to add as a party defendant the Corporation Counsel of the District of Columbia, and secondly, sought an order authorizing the law school to expend funds to comply with a condition of an important federal grant. These motions were denied in the court's January 11 order.

The motion for preliminary injunction requested the following relief:

[T]o enjoin the defendants, and all persons acting under their authority or at their direction, from taking, authorizing, or directing any actions which purport to *exercise or assert control over the fiscal policies or administrative management,* including any over the daily operations or activities of the Antioch School of Law and to enjoin them from taking any action, the effect of which is to *interfere*

---

2. Plaintiffs' complaint seeks (1) a declaration that the law school is an entity independent of and separate from the University, or, alternatively, (2) a judgment that the law school may conduct its fiscal and administrative affairs without "interference" from the University, with injunctive relief and continuing supervision of the court to enforce that judgment.

3. Super.Ct.Civ.R. 24(a) reads:
INTERVENTION OF RIGHT. Upon timely application anyone shall be permitted to intervene in an action: (1) when applicable law confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

4. Intervenors and the former co-deans will be collectively referred to as appellants.

*with the control or operations, fiscal or otherwise,* of the Antioch School of Law and to require defendants, their agents and all persons acting in concert with them, to cancel, rescind and withdraw all notice of adverse claims served upon banks in which the funds of the Antioch School of Law and its affiliate organizations, including the Urban Law Institute and the Institute of Law and Justice have been, will now, or in the future shall be on deposit. [Emphasis added.]

The University's cross-motion for preliminary injunction was premised on Counts I and II of their counterclaim to the plaintiffs' complaint. It requested an accounting of University funds held by the co-deans and a transfer of all funds to the Central Business Office. In addition, the University requested documents pertaining to incorporation of the law school or related entities, complete data on enrolled students, and data on any and all bank accounts.

On January 11, 1980, Judge Revercomb entered the order which is now before us on appeal [hereinafter *Order*]. This *Order* (1) denied the preliminary injunctive relief sought by the appellants; (2) granted the University's motion for a preliminary injunction to the extent that the court ordered the transfer to the University of all funds received in connection with the operation of the law school except restricted funds where the parties agreed that such funds required special handling because of specific conditions imposed by the grantors or donors; (3) dissolved the previously imposed temporary restraining order; and (4) ordered all costs, including transcript costs and legal fees incurred in connection with the hearing on the cross-motions for preliminary injunctions, to be paid by the defendant University. In addition, Judge Revercomb disposed of the various prehearing motions with the following notations:

(1) Defendants' Motion to Strike the Indented Portion of the Caption of the Complaint was DENIED insofar as it challenged the capacity of the co-deans to sue on behalf of the students, clients, faculty and staff of the Antioch School of Law and was otherwise GRANTED.

(2) Defendants' Motion to Dismiss the Complaint insofar as it was filed on behalf of the Antioch School of Law was GRANTED.

(3) Defendants' Motion to Dismiss the Complaint insofar as it was filed on behalf of plaintiffs Edgar S. Cahn and Jean Camper Cahn as Co-Deans and Director was DENIED, without prejudice.

(4) Defendants' Motion for Judgment on the Pleadings was DENIED, without prejudice.

(5) Plaintiffs' Motion for an Order Authorizing Expenditure of Monies was DENIED.

(6) Plaintiffs' Motion to Amend Complaint by Adding a Necessary Party (D.C. Corporation Counsel) was DENIED.

Having noted their appeal from the *Order*, the appellants filed a motion in this court to stay or modify the preliminary injunction pending appeal. Oral argument was heard on this motion and an order was entered March 21, 1980, which denied this motion without prejudice to a renewal of a request for relief before the merits division, and in addition, established an expedited briefing schedule on the merits.

What is before this court is the appeal from the trial court *Order* brought by co-deans Edgar S. Cahn and Jean Camper Cahn in their representative capacity, client-intervenors Theresa Felton and Webster Young, and student-intervenors Philbert Davenport, Mark A. Venuti, and Richard Erlich.[5]

5. The appeal as to any students who have graduated is moot as to them. It should also be emphasized that the co-deans, the Cahns, have asserted no personal stake in the outcome of this action and appear only in their representative capacity.

The trial court order denying without prejudice the University's motion to dismiss the cause of action alleging lack of standing and capacity of the party-plaintiffs is not a final appealable order and is not on review. D.C. Code 1973, § 11–721.

## II. CRITERIA FOR PRELIMINARY INJUNCTION

■ Preliminary injunctive relief is committed to the sound discretion of the trial court and our task as a reviewing court is to consider whether the trial court abused its discretion or " 'rested [its] analysis upon an erroneous premise' " in the required findings of fact and conclusions of law. *District Unemployment Compensation Board v. Security Storage Co.*, D.C.App., 365 A.2d 785, 787 (1976), *cert. denied*, 431 U.S. 939, 97 S.Ct. 2651, 53 L.Ed.2d 256 (1977), *quoting A Quaker Action Group v. Hickel*, 137 U.S. App.D.C. 176, 180, 421 F.2d 1111, 1115 (1969). The trial court considered four factors in evaluating whether the injunction should be issued. These factors were whether the moving party had demonstrated: (1) likelihood of irreparable harm in the absence of a preliminary injunction; (2) likelihood of success on the merits of the underlying cause of action; (3) that the "balance of injuries" favors granting an injunction; and (4) that the public interest would be served by granting the injunctive relief sought. These considerations, as enunciated in *Virginia Petroleum Jobbers Association v. Federal Power Com'n*, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958), govern this court in consideration of motions for temporary relief. *Don't Tear It Down, Inc. v. District of Columbia*, D.C.App., 395 A.2d 388, 390 (1978); *Wisconsin Avenue Associates, Inc. v. 2720 Wisconsin Avenue Cooperative Association, Inc.*, D.C.App., 385 A.2d 20, 23 n. 3 (1978); *Ballard & Associates, Inc. v. Mangum*, D.C.App., 368 A.2d 548, 553 (1977); *District Unemployment Compensation Board v. Security Storage of Washington, supra; Wieck v. Sterenbuch*, D.C.App., 350 A.2d 384 (1976).

The appellants do not contest that these four factors are the appropriate considerations for the granting of temporary relief. Their argument concerns the weight given to the factors, the degree of showing that must be made on each and the ultimate balancing that determines the outcome of the case. In addition, they take exception to the legal conclusions of the trial court. We will review the trial court's analysis of these four factors in its decision of whether to grant a preliminary injunction in this case.

### A. Irreparable Harm

"While it is fundamental to the granting of an injunction that the court make specific findings on all prerequisites for such relief, the *most important inquiry* is that concerning irreparable injury." *Wieck v. Sterenbuch, supra* at 387 (emphasis added). Injunctive relief is extraordinary relief and will not be granted lightly. *See Vargas v. Chardon*, 405 F.Supp. 1348, 1353 (D.Puerto Rico 1975) (extraordinary remedy of preliminary injunction requires clear and convincing proof). "[T]he primary justification for the issuance of a preliminary injunction 'is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.' " *Wieck v. Sterenbuch, supra* at 387–88, *quoting Canal Authority v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

The appellants have argued that in the absence of preliminary relief, the law school, as it now exists, will cease. Their fears are that the school will lose its A.B.A. accreditation, lose its government grants, lose its present student body to other institutions and be unable to attract quality students for the upcoming term. Despite these allegations, the trial court stated it could not conclude that "the survival of the law school would be more certainly assured by local control of revenues attributable to the law school." *Order*, Conclusion No. 11. We are unable to find error in this regard. *See Perry v. Perry*, 88 U.S.App.D.C. 337, 338–39, 190 F.2d 601, 602–03 (1951).[6]

■ Appellants have framed their argument for preliminary relief in terms of

6. Subsequent to docketing of the record, the parties have sought to bring to our attention later developments respecting grant funding and accreditation. Since those facts do not affect our jurisdiction, *vis-a-vis* mootness, we do not consider them in our disposition. We confine ourselves to the record on appeal.

maintenance of the status quo, *i. e.*, the survival of the law school. The trial court not only found no immediate threat to the law school, but also found that the matter at stake is the fiscal control and management of the law school. The "status quo" in the context of a preliminary injunction "has been interpreted to refer to the last uncontested set of facts preceding the pending controversy." *Garshman v. Pennsylvania State University,* 395 F.Supp. 912, 920 (M.D.Pa.1975). It appears that it was the law school which disrupted the status quo by refusing to forward law school funds to the University's central administration. *See Order,* Findings 88 and 89. The temporary relief requested by the appellants seeks to change that procedure by authorizing the law school to maintain these funds in its own separate accounts and to exercise complete dominion and control over them. Essentially the temporary relief sought here would give the appellants the ultimate relief they seek in their complaint.[7] Such a state of affairs requires a strong showing of irreparable harm in the absence of granting the relief. *Cf. Murphy v. Washington American League Base Ball Club, Inc.,* 116 U.S.App.D.C. 362, 365, 324 F.2d 394, 397 (1963) (no abuse of discretion in not granting preliminary relief in absence of irreparable harm and the injunction sought to change the status quo); *Dressler v. Wilson,* 155 F.Supp. 373, 378 (D.D.C.1957) (temporary relief will be rarely allowed where relief to be accorded would be the same as would be accorded in a final judgment).

Appellants also contest the trial court's conclusion that the University may suffer irreparable harm if it is denied the right to manage and marshall all of its assets which justified the partial granting of the University's cross-motion for preliminary relief. *See Order,* Conclusion No. 13. Appellants argue that the court failed to make required factual findings regarding the irreparable harm that the University would suffer in the absence of granting the relief and that the court applied a different standard of the likelihood of harm to the University as opposed to the appellants.

The *Order* contested in this appeal consists of forty-one pages. The court ably sifted the long, complicated history of the relationship between the various parties and institutions involved in this case. Much time and effort was devoted to describing the financial difficulties of the University and the law school. What was at stake in the University's cross-motion for preliminary relief was the right to manage and marshall all of its assets. Each day that the University was denied this right, the right was irretrievably lost. The consequences that would flow from the loss of this right can only be determined by the future course of events. We think that it is a fair reading of the court's *Order* that the denial to the University of its right to manage and marshall its funds and assets pendente lite constitutes in and of itself irreparable harm in the circumstances of this case. While the consequences that may flow from the loss of the right may be speculative, the court could reasonably find that the loss of the right for any period of time constitutes serious harm to an institution that admittedly was on the brink of bankruptcy.

### B. *Likelihood of Success on the Merits*

#### 1. The Standard

We accept as sound the Circuit Court's discussion in *Washinton Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 182 U.S.App.D.C. 220, 559 F.2d 841 (1977), concerning whether a mathematical probability of success on the merits is always necessary for the granting of a preliminary injunction.[8] "The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors [of the analysis]." *Id.* at 222, 559 F.2d at 843. But we cannot agree with the appellant's argument that in the circumstances of this case the appropriate

---

7. *See* note 1, *supra.*

8. This opinion refined and expanded the rule previously announced in *Virginia Petroleum Jobbers Assoc. v. Federal Power Com'n, supra.*

showing necessary for the awarding of the relief requested would be the presenting of a "substantial case on the merits." *Id.*

■ Instead, the appellants' failure to show by clear and convincing proof[9] the imminent threat of irreparable injury and their request for a change in the status quo weights the balance of the equities so as to require a meaningful showing of probable or likely success on the merits. *See Trieb-wasser & Katz v. American Tel. & Tel. Co.,* 535 F.2d 1356, 1360 (2d Cir. 1976).[10]

### 2. Legal Theories of Relief

Appellants have been less than clear in framing justification for entitlement to the relief they have sought. Much of the pleadings and briefs relate an unhappy story of administrative and fiscal problems within a University community. The court is asked to intervene and tell everyone how the academic affairs should be ordered for the common good.

After an evidentiary hearing of three weeks, the only legal theory of relief which could be discerned by the trial court was that "the revenues and assets of the Law School are subject to a charitable trust, and that surrender of these assets to the University's central administration will result in a breach of that trust." *Order,* Conclusion No. 13. We hold that the court did not abuse its discretion in concluding that "the evidence at this time is inadequate to support a conclusion that a special charitable trust exists with regard to the law school. . . .," *Order,* Conclusion No. 15 ; or that the trustees as fiduciaries of the Uni-

versity are aware of their fiduciary obligations to the law school, *see Order*, Conclusion No. 16.[11]

On appeal, appellants argue that the evidence presented supported two additional bases for their likely success on the merits. First, they argue that "commitments," which are asserted to be actual contractual agreements between the University and the law school, provide for an independent administration of the law school. They argue that a resolution passed by the Board of Trustees of Antioch University on December 5 and 6, 1975, established the basis for this conclusion. This resolution reaffirmed the Board of Trustees' commitment to a law school "built around a teaching law firm" and established an *"interim governing structure* pending a determination by the Board of Trustees of *ultimate governance* relationship between the School of Law and the College." (Emphasis added.) The resolution goes on to name a Board of Governors of the law school and to delineate its authority. The resolution specifies those matters over which the Board of Trustees of the University specifically reserves authority unto itself. And finally, the resolution "expressly charges the law school Board of Governors to develop recommendations respecting the *ultimate structure* of relationships between the Law School and the College. . . ." (Emphasis added.) Although the court understandably did not draw a specific legal conclusion concerning this presently asserted contractual basis for relief, the record clearly reflects its rejection of such a rationale.[12]

---

9. *See Vargas v. Chardon, supra.*

10. The trial court appropriately considered this standard in its *Order. See Order,* Conclusion No. 12.

11. *See* Antioch College Board of Trustees' resolution dated October 27, 1979, where it is resolved:

[T]hat the Board is fully aware and takes cognizance of the concerns expressed by the Board of Governors with respect to the financial viability of the University. The Board of Trustees assures the Board of Governors that it has as its immediate objective the survival and growth of the University with recogni-

tion of the interest of all units, and in particular the students, faculty, administration and clients of the School of Law, which the Board recognizes as a unique and outstanding achievement. The Board welcomes the initiative taken by the Board of Governors in inaugurating discussions with the Board of Trustees concerning the integrity and development of the School of Law, and asks the President to furnish to the Governors the financial data on which projections for the current fiscal year are based.

12. The trial court made the following Conclusions related to this issue: (1) the Trustees had discretionary power to set University priorities,

*See Warner Corp. v. Magazine Realty Co.,* D.C.App., 255 A.2d 479, 481 n. 4 (1969).

█ Upon the basis of this record, we conclude that the trial court was amply justified in impliedly rejecting appellants' contractual argument based upon this resolution. The University is a not-for-profit corporation organized under the law of the state of Ohio. The University, as any corporation, is governed by the statutes of the state of its incorporation, its articles of incorporation and its bylaws. The law school "is not organized as a corporation or other judicial entity." Concededly, it "was established pursuant to a resolution of the Board of Trustees of Antioch College (the predecessor in name to Antioch University) dated December 3 and 4, 1971." *Order,* Finding No. 1. Resolutions adopted by the University in accordance with its articles of incorporation and bylaws effectuate the will of the corporation. *See generally Brown v. National Loan & Investment Co.,* 139 S.W.2d 364 (Tex.Civ.App.1940). However, the plain meaning of this resolution bespeaks a delegation of power for the establishment of an "interim governing structure" of the law school as it relates to the University. It cannot be concluded that such a delegation deprived the Board of Trustees of the power given to them in Article III of the University's Articles of Incorporation, to wit: "All of the rights and powers of the corporation and the entire control and management of its College, property and affairs shall be vested in and exercised by a Board of Trustees composed of twenty-five (25) persons." [13] In fact, a

contract conveying such plenary power vested by corporation charter in the trustees would be void. *See Kennerson v. Burbank Amusement Co.,* 120 Cal.App.2d 157, 172, 260 P.2d 823, 832 (1953).[14]

█ In the alternative, appellants urge us to apply the rationale of estoppel to hold that by the University's acquiescence in autonomous operation of the law school, the University is estopped to deny its autonomy at this time. This doctrine can have no relevance unless the party who seeks to invoke it is an independent entity from the one which is estopped. Thus, to apply the doctrine of estoppel on behalf of the Board of Governors or the law school, the trial court would have been required to find that these bodies are independent legal entities from the University. *See generally* 28 Am. Jur.2d, *Estoppel and Waiver* § 39 (1966). Appellant has not demonstrated that such was urged upon the trial court and it cannot be said that the record compels such a finding.

█ The student-intervenors to this action have asserted their contractual rights to attend an institution accredited by the ABA and which maintains a teaching program as described in the law school brochure. *See Galton v. College of Pharmaceutical Sciences, Columbia University,* 70 Misc.2d 12, 332 N.Y.S.2d 909 (Sup.Ct.Spec. Term, New York County, Part I, 1972); *Behrend v. State of Ohio,* 55 Ohio App.2d 135, 379 N.E.2d 617 (1977). It is a general rule "that the relationship between a uni-

*Order,* Conclusion No. 10; (2) there was no legal basis for divesting the Trustees' legal control over assets, *Order,* Conclusion No. 12; (3) the legal title of assets are vested in the Trustees, *Order,* Conclusion No. 18; (4) the power of the Board of Trustees to alter or revoke the delegation of authority contained in the December 1975 resolution, *Order,* Conclusion No. 21; and (5) the University's Board of Trustees possesses the ultimate fiscal and administrative dominion over the law school, *Order,* Conclusion No. 23.

**13.** *See generally Plechner v. Widener College, Inc.,* 418 F.Supp. 1282 (E.D.Pa.1976), *aff'd,* 569 F.2d 1250 (3rd Cir. 1977), where after the affiliation of two corporate educational bodies the

majority of the Board of Trustees were named by the controlling University irrespective of persistent attempts of the founder of the law school affiliate to maintain control over the governance of the law school.

**14.** The appellants also assert that the law school and its Board of Governors are third party beneficiaries of contracts between the University and students, grantors and accrediting bodies. However, if the law school is an integral component of the University and the Board of Governors, a delegatee of University power, neither have the independent corporate identity necessary to confer third party beneficiary status.

versity and its students is contractual in nature. It is also accepted that the terms set down in a university's bulletin become a part of that contract." *Basch v. George Washington University*, D.C.App., 370 A.2d 1364, 1366 (1977). However, we do not find error in the trial court's failure to make a finding on the nature of the students' contractual rights in this case since we conclude that the students would not be entitled to the relief they seek of a preliminary injunction affecting the fiscal affairs of the University and the authority of the Board of Trustees to govern the University. *See The Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 641 (1819); *Splawn v. Woodward*, 287 S.W. 677 (Tex.Civ.App.1926). Despite any contract rights the students have acquired, "[t]he board of trustees has the jurisdiction to make the policy determination of the continued existence of the various departments with the university." *Behrend v. State of Ohio, supra*, 379 N.E.2d at 621. Thus, even if the University goes bankrupt and the law school fails, the students' remedy is not an interference in the trustees' control of the University. Instead, their remedy would be to seek damages for the harm that has befallen them due to lack of accreditation, professional certification problems, delay, etc. *Id.* "The development and continuation of the university's courses of study should reside within the sound discretion of the university's board of trustees and the administrative officials." *Id.*

We are satisfied that the trial judge did not err in concluding that appellants are not likely to succeed on the merits of the action, and alternatively, that the University is likely to succeed.

## C. *Assessing the Impact of Injuries*

■ The pivotal factors in favor of denying the appellants' motion for relief were the trial court's conclusions that the appellants were not likely to succeed on the merits and would not suffer irreparable and immediate harm if their motion was denied. At the same time, the court concluded that the University "may suffer serious injury if it is not permitted to exercise control over all assets for which it is responsible." *Order*, Conclusion No. 19. The appellants argued that the University should have to measure up to the standard of certainty of prospective injury before it could be reasoned that the relative injuries favored a partial granting of their cross-motion for preliminary relief. However, the trial court concluded that the University will likely succeed on the merits. In addition, it is the University which seeks to maintain the status quo in the fiscal administration of the law school. As we have previously indicated, we conclude that the trial court implicitly found that in these circumstances each day that the University was denied its right to control and manage its funds, it was irreparably harmed. The actual consequences of this denial were the only matters that were left to speculation. The trial court did not err in concluding that the balance of the equities shifts to the University and warrants granting of its motion and a denial of the appellants'.

## D. *Public Interest*

■ Finally, the trial court concluded that "[a] discontinuation of the operation of the Antioch School of Law in its present form might well have an adverse impact on the public interest." However, it also stated that the evidence does not support a conclusion that "resumption of control over the revenues attributable to the law school" by the University would "result in termination of the services now rendered. . . ." *Order*, Conclusion No. 20. We hasten to add that although the operation of any private college or university "is touched with eleemosynary characteristics," it does not lose its character as a private corporation. *University of Miami v. Militano*, 184 So.2d 701 (Dist.Ct.App.Fla.1966). The trustees of the University are vested by its charter of incorporation with the power to conduct its affairs and are not subject to the interference of the state in that control in absence of an abuse of their fiduciary duties. *Cf. The Trustees of Dartmouth College v. Woodward, supra*, 17 U.S. (4 Wheat.) at 634–38 (a corporation established for pur-

poses of education does not, per se, make it a public corporation liable to control of the legislature).

We are satisfied that the trial court correctly considered the appropriate factors relevant to the granting of preliminary relief. A full and ample record was made. The court has made detailed findings of fact which are supported by the record and its conclusions of law are not erroneous. Accordingly, the trial court *Order* of January 11, 1980, denying the appellant's motion for preliminary relief and granting in part the appellee's motion is

*Affirmed.*