Edgar S. CAHN and Jean Camper Cahn, Appellants,

v.

ANTIOCH UNIVERSITY, et al., Appellees.

ANTIOCH UNIVERSITY, Appellant,

v.

Edgar S. CAHN and Jean Camper Cahn, Appellees.

Nos. 82–1137, 83–187 and 82–1138.

District of Columbia Court of Appeals.

Argued May 9, 1984.

Decided Aug. 29, 1984.

David M. Silberman and Herman Schwartz, Washington, D.C., for Edgar S. Cahn and Jean Camper Cahn, appellants in Nos. 82–1137 and 83–187 and appellees in No. 82–1138.

Terrence O'Donnell and J. Alan Galbraith, Washington, D.C., for Antioch University, et al., appellees in Nos. 82–1137 and 83–187 and appellants in No. 82–1138.

Before PRYOR and TERRY, Associate Judges, and REILLY, Chief Judge, Retired.

TERRY, Associate Judge:

This case presents what we hope is the last chapter of an acrimonious dispute between Antioch University and the former deans of its law school. The former deans contend that the trial court erred in not

awarding them damages for lost salary as faculty members under their employment contract. Antioch University argues in its cross-appeal that appellants breached the fiduciary duty which they owed to the University. As damages, the University seeks to recover the expenses it incurred in *In re Antioch University*, 418 A.2d 105 (D.C. 1980), under the bad-faith exception to the American rule on attorney's fees. The University also contends that it is entitled to recover $8,000 which appellants paid to two attorneys out of University funds without authorization.

We hold that the trial court erred in concluding that the Cahns owed a fiduciary duty to the students and clients of the law school. As employees of Antioch University, the Cahns' only fiduciary duty was owed to the University. We therefore hold that the University is entitled to recover the $8,000 which it seeks as damages for the Cahns' breach of that duty, and to that extent we reverse the judgment of the trial court and remand the case for modification of the judgment in favor of the University. In all other respects, however, we affirm the judgment below, thereby rejecting not only the Cahns' salary claims but also the University's claim for attorney's fees and litigation expenses.

## I. PROCEDURAL HISTORY

In November 1979 Edgar S. Cahn and Jean Camper Cahn, co-deans of the Antioch School of Law, filed a complaint against Antioch University seeking "(1) a declaration that the law school [was] an entity independent of and separate from the University, or, alternatively, (2) a judgment that the law school [could] conduct its fiscal and administrative affairs without 'interference' from the University, with injunctive relief and continuing supervision of the court to enforce [the] judgment." *In re Antioch University, supra*, 418 A.2d

at 107 n. 2. After a lengthy hearing on the parties' cross-motions for preliminary injunctions, the trial court entered an order in favor of the University directing, in part, that

> the Co-Deans and responsible administrative personnel of the Antioch School of Law transfer to the Central Business Office of Antioch University in Yellow Springs, Ohio, all funds received in connection with the operation of the Antioch School of Law ....

That same day the Cahns received a letter from William Birenbaum, president of the University, terminating their employment by Antioch University "in any role whatsoever ...." The trial court's order granting the University's motion for a preliminary injunction was affirmed by this court. *In re Antioch University, supra.*[1]

In October 1980 the Cahns amended their complaint to include a claim for breach of contract. Specifically, the Cahns alleged that their "termination ... was unlawful and in violation of their contracts as members of the faculty, University practices and prevailing academic standards and practices." The University in turn filed an amended counterclaim against the Cahns in which it sought to recover (1) $250,000 in damages on a breach of fiduciary duties claim, (2) $8,000 for unauthorized legal services paid by the Cahns out of University funds, (3) $2,331 for gardening and landscaping services performed on the Cahns' personal residence, (4) $5,000 for salary advanced to Edgar Cahn in 1979, (5) $2,206 for money refunded to the Cahns by two airlines for several unused plane tickets which had been purchased with University funds, and (6) $2,070.40 for "double payment of wages from the spring of 1979."[2] Following a three-day trial without a jury, the court took the matter under advisement.

---

1. On June 10, 1981, the trial court entered an order awarding the Cahns $72,012.12 in attorney's fees and costs. In *In re Antioch University*, 482 A.2d 133 (D.C.1984), also decided today, we reverse that award.

2. The amended counterclaim also prayed for certain other declaratory and injunctive relief, none of which is at issue in this appeal.

In its findings of fact and conclusions of law, issued three months later, the court ruled that the Cahns had not breached any of their fiduciary duties toward the University. With respect to the Cahns' breach of contract claim, the court determined that the Cahns "held separate and distinct positions as members of the faculty" and that the "action taken by [them] which provided sufficient cause to discharge them as administrators [did] not provide *de facto* a sufficient basis for discharging them as members of the faculty prior to the expiration of the employment period." Nevertheless, the court concluded that since the Cahns had not taught during the 1979–1980 academic year, they had not suffered any damages from lost salary due to their improper termination as members of the faculty. The court did, however, award them damages for the loss of fringe benefits from January 12 through June 30, 1980. The court also held that the Cahns "were not entitled to notification of non-reappointment as faculty by December 15 because they failed to prove by a preponderance of the evidence that they were members of the faculty bargaining unit and therefore had rights under the collective bargaining agreement or that the University had agreed on a policy binding on [it] and applicable to the school of law to give notification of non-reappointment by December 15 to law school faculty not members of the bargaining unit." The University and the Cahns bring these cross-appeals.[3]

## II. THE EVIDENCE AT TRIAL

### A. *The Breach of Contract Claims*

On December 16, 1971, Dr. James Dixon, who was then the president of Antioch College, appointed the Cahns "Professor[s] of law and Co-Dean[s] of the Antioch School of Law." On July 3, 1973, President Dixon reappointed them co-deans for a one-year term. A form accompanying their letters of appointment designated their positions as "administrative." In July of 1974 the Cahns were both offered three-year appointments, but they declined the offer, saying that they would not accept any appointment in excess of one year. They continued as co-deans for the next three years under annual reappointments. Pursuant to a reorganization of the College in 1977,[4] the Cahns were appointed "co-provosts of the Antioch School of Law" for the 1977–1978 academic year, and reappointed co-provosts for the subsequent year.[5] They were not given any written notification of reappointment for 1979–1980, their last year at the law school.

Edgar Cahn testified that from the outset he and his wife served as members of the faculty. He stated that they never received any repudiation of their 1971 appointments as professors of law and that the only risk which they associated with the litigation against the University was that they would lose their positions as deans. If this were to occur, Mr. Cahn testified, they would "simply walk in the next day as faculty member[s] and try to work together as a community."[6] When asked whether this reversion to faculty status was guaranteed in any document, Cahn replied, "It was based on an explicit agreement that did not have to be reduced and to my knowledge was not reduced to writing." Edgar Cahn further testified that even though the University's last letters of appointment provided that he and his wife

---

3. The trial court's resolution of the other claims is not contested here.

4. As part of the reorganization, the college changed its name to Antioch University on December 22, 1977.

5. Edgar Cahn testified that as provosts he and his wife "were given geographical jurisdiction over all academic activities in the Washington area whether law or non-law and all activities

nationwide that were law-related ...." He insisted, however, that each of them be able to retain the title of dean, since the term "provost" was not in the lexicon of the American Bar Association or the Federal Judicial Council.

6. The Cahns maintained at trial that they had been granted lifetime tenure. This claim was rejected by the trial court and is not pursued by the Cahns on appeal.

could be terminated for financial reasons, the University would still have had "to deal with [their] rights as faculty members which would be for a remuneration scale appropriately agreed to by the collective bargaining agreement ...." [7]

Patricia Eames, a member of the law school faculty during the 1978–1979 and 1979–1980 academic years, testified about the law school's policy on notice of non-reappointment. She stated that during her tenure notice of non-renewal would be given to a faculty member by March 15 of his first year or December 15 of his second year of teaching. This policy applied to both members and non-members of the collective bargaining unit, provided that they were on the faculty. Eames stated that the faculty "asked the deans to initiate legal proceedings to prevent the university from letting the law school go down the drain." The faculty assumed that if the legal battle was lost, the Cahns would lose their positions as deans, but it never anticipated that by bringing that action the Cahns would also jeopardize their positions as faculty members. [8]

Professor James P. Dixon, the former president of Antioch University (then Antioch College) responsible for the appointment of the Cahns as co-deans and professors of law at the law school, testified that he never entered into any agreement with the Cahns regarding residual faculty status. He said that in appointing them professors of law, he was bestowing an academic title upon them which "carried ... the connotation of rank ... and scholarly status within the legal profession," but that their teaching "was not a primary consideration" in their appointment as deans.

William M. Birenbaum, who replaced President Dixon in 1976, testified that during his presidency no dean or provost connected with the University had achieved faculty status by virtue of teaching while holding the position of provost or dean. President Birenbaum stated that the personnel policies affecting the law school faculty were expressed in the collective bargaining agreement. That agreement did not cover the Cahns since, as members of management, "they were front-line negotiators ... so they could hardly be covered by the documents conferring rights upon themselves." Birenbaum explained that when he wrote in his letter of dismissal to the Cahns that their employment was "terminated in any role whatsoever," he did not intend to sever their connection as members of the faculty because they had never been faculty members in the first place. [9]

7. In 1976 all full-time faculty members of the Antioch School of Law entered into a collective bargaining agreement with the University. This agreement, which was in operation during the Cahns' last academic year, excluded deans and other administrative personnel from membership in the bargaining unit.

In February of 1979 Maryanne Mott Meynet offered the law school a $25,000 grant to establish a position, the occupant of which "would be expected to spend a significant portion of his/her time on further research, development, and expansion of the philosophy of clinical legal education." Mrs. Meynet designated Jean Camper Cahn as the recipient "regardless whether she continue[d] or discontinue[d] any of her activities as Co-Dean of the School of Law, Director of the Urban Law Institute, or Dean of Graduate Studies." The law school Board of Governors (see note 10, *infra*) adopted a resolution on March 19 accepting the grant. At its May 16–18 meeting, however, the Board of Trustees of the University declined the grant offer because "the university [was] unable to comply with [its] terms...."

8. Eames also testified that administrative and teaching positions ran on "parallel tracks" so that, if a teacher-administrator "arouse[d] the displeasure of the administration and lost his administrative position, he would revert to his faculty role." She explained that this policy was premised on the concept of academic freedom: "The individual must have his or her status as a faculty person secured and protected in order to be able to operate freely with the administration, but ... higher administration must be able to under appropriate managerial circumstances deal with the person in his or her capacity as manager."

9. President Birenbaum also testified that the fact that the Cahns taught did not mean they were members of the faculty, since "[m]any people who do not have faculty rank teach."

Ronald E. Pollack, the Cahns' successor as dean of the Antioch School of Law, testified that after his appointment as dean, he sought and was granted faculty status at a full meeting of the faculty. Dean Pollack stated, however, that "[t]he faculty status conferred upon [him] by the faculty did not confer any greater status with regard to protection of the job than [he] had from the president's appointment." He explained that, as dean, he represented management and that the December 15 deadline for notice of non-reappointment would not apply to him because he was not covered by the collective bargaining agreement. Dean Pollack further testified that the law school never adopted the model policy of the American Association of University Professors regarding notification of non-reappointment and that the revised pre-tenure appointment policies found in the University's personnel manual and apparently applicable to all campuses did not affect the law school.

### B. *The Breach of Fiduciary Duty Claims*

In May 1979 the University found itself in a severe financial crisis. As the trial court found, "[t]he payroll of the entire University, including the School of Law, went unpaid and the University was without resources to pay substantial outstanding debts to creditors, including debts in connection with law school operations." At a meeting on May 18 and 19, the law school Board of Governors [10] adopted a resolution directing the law school management

> to take all steps to insure that all of its fiduciary obligations [were] discharged. This include[d] proper disposition of all restricted funds whether received from private or public sources. The management [was] further directed to identify the fiduciary obligations of the law

school both as to amount and source, of the measures taken to satisfy these obligations, and to make a written report thereof to the Executive Committee [of the Board of Governors] at its June meeting.

In response to the resolution, the Cahns engaged the services of Professor Terence J. Anderson of the University of Miami School of Law, an expert in such matters, who prepared four memoranda "approach[ing] the problem from different perspectives." The text of the resolution, meanwhile, was communicated by telegram to President Birenbaum.

On June 2, after rejecting a proposal that it declare bankruptcy, the University's Board of Trustees resolved to impose stringent fiscal limitations on University operations during the summer. The Board directed the University's various units to maintain accounts on a cash basis, with weekly reporting, and to transfer all cash promptly to the University in Ohio. The minutes of the law school Board of Governors meeting on June 25 describe what happened next:

> Mr. Poirier [the chairman of the Board's Executive Committee] opened the conference with a report of a telephone call he had received from an agitated President Birenbaum who alleged that the Law School was not in compliance with the Board of Trustees' resolution requiring all University units to transfer all cash to the University. The President said that, unless the Law School complied with this resolution, he would "pull their plug" at the end of the month. Though Mr. Poirier denied the allegation, the President "ordered" Mr. Poirier to inform Co-Deans Cahn of his intended action.

10. The Board of Governors was established pursuant to a resolution adopted by the University's Board of Trustees at a meeting held on December 5 and 6, 1975. The Board of Trustees specifically reserved to itself authority over several matters, including "[f]inal approval of the budget for the ... School of Law" and "[a]pproval of

any separate incorporation or other changes in the procedures for or terms of affiliation between the School of Law and the [University] which would be inconsistent with the scheme set forth in the [University's] Articles or Bylaws ...."

After discussing the financial difficulties the law school was encountering with the University, the Board agreed to make a final decision on the appropriate course to follow after Inez Reid, one of its members, had an opportunity to discuss the situation with President Birenbaum.

On June 28 John W. Cummiskey, the chairman of the Board of Governors, wrote to President Birenbaum and informed him that the law school was depositing all funds received from federal grants in bank accounts in the District of Columbia and that it would not be transferring such funds to Yellow Springs. He also sought an accounting from the University for restricted funds previously transferred to Yellow Springs to make sure that all obligations chargeable to those funds were met, and that those funds were used for no other purpose. The University's grave financial condition remained unabated throughout the summer. On September 4, as the trial court found, President Birenbaum "apparently advised the managers of units in disagreement with policies of the University administration that they could seek separation if they so chose." On September 20 Mr. Cummiskey wrote to the chairman of the University's Board of Trustees, Douglas Ades, to advise him that the law school had decided to accept President Birenbaum's offer.[11]

Meanwhile, on September 14, the Cahns received a letter from Charles Docter, an attorney whom they had retained that summer pursuant to the Board of Governors' directive, advising them to file a preemptive Chapter XI proceeding for the law school under the Bankruptcy Act. Mr.

Docter explained that he had "analyzed ... certain questions concerning the exact nature of the entity of Antioch School of Law and ... concluded ... that there [was] enough of an entity or unincorporated association to permit a filing of a Chapter XI." His letter continued:

We [his firm] would, of course, agree with you that if we felt that the matter with the University could be negotiated shortly after and during the litigation which you apparently now intend to file that this would be the appropriate course. However, our advice has been based upon the assumption that you believe the filing of a Chapter XI under the old Act or a Chapter 11 under the new Code by the University is eminent [sic].... [A] chapter proceeding filed by the University gives the Law School no choice other than to protect itself now by the prompt filing of a Chapter XI. The Law School's lack of options is further heightened by the ABA's efforts to remove accreditation.[12]

On September 23 the Board of Governors adopted a resolution whereby it decided

to do all things necessary to protect the financial viability of the School of Law and to insure that it retains the resources and capacity to discharge fully its obligations to students, clients, employees, creditors and funding sources....

Toward these ends the Board authorized its chairman

to designate a team fully empowered to open discussions with the University to explore ways to best achieve those ends including seeking corporate insulation,

---

11. Mr. Cummiskey explained in his letter that this decision was prompted by the University's inability to make three changes which the Board of Governors deemed critical: "decentralization of fiscal control, incorporation of the School of Law to insulate it from future deficits, and timely intervention to turn Yellow Springs around." Furthermore, Cummiskey objected to the "demand by the University administration that [the Board] cut $100,000 from [its] budget and lend $275,000 to the University ...."

12. Mr. Docter wrote to the Cahns again on September 19 in connection with "some advice concerning certain funds." He stated that "before [he] could give the advice requested, [he] would need a breakdown of the exact titling of all bank accounts with an indication who the authorized signatories on these accounts were and the approximate balances." Finally, he said that he had requested "an analysis of the exact nature of the contracts and grant awards to determine to which entity these grants or contracts were actually awarded," but had not yet received any of this information.

affiliation, independence, deferred withdrawal or immediate severance ....

On October 9 John W. Karr, another attorney whom the Cahns had consulted, advised them by letter that in view of the Board's September 23 resolution, "the conservative course" to follow would be "to preserve the *status quo ante* by insulating the assets against any attempt by the University summarily to assume control of them ...." Mr. Karr went on to say that the University's "summary invasion" of the law school's assets, particularly its cash assets, would make it impossible for the law school "to fulfill contractual obligations both to students and to various government agencies from which grants ha[d] been obtained. Even more significant," Mr. Karr stated, was "the certainty that any depletion of these assets [would] make it impossible to meet obligations to the approximately 1,000 indigent persons who [were] currently" the Urban Law Institute's clients.[13] Thus Mr. Karr proposed that the Cahns "place all of the law schol's assets into a trustee's account, leaving the cash available, of course, to meet the school's obligations to faculty, staff, and creditors as they [arose]." Such an account was opened in a local bank, with Karr as trustee.[14]

The University's Board of Trustees met on October 27 and adopted two resolutions with regard to the law school. The first, a general resolution, passed in public session, included a statement reaffirming the Board of Trustees' commitment to the welfare of the law school. The second resolution was approved during an executive session. It directed the president to "[instruct] the Co-Deans ... to account for all funds received since the date of the last complete accounting and to transfer to the Central Office all funds on hand or under the control of the administration of the School of Law ...." This resolution concluded by stating that "as soon as practicable" after the law school had complied with University policies, the president would "arrange a meeting between the Board's Standing Committee on the School of Law and the Board of Governors [of the law school] to reassess the relationship between the Board of Governors and the Board of Trustees...."

On November 1 a Mailgram was sent to the Cahns containing the substance of the October 27 resolution. Mr. Cummiskey responded with a Mailgram on November 5 requesting that implementation of the University's demands be deferred pending a meeting of the Board of Governors. President Birenbaum denied this request by telegram on November 8 and instructed the Cahns to comply with the October 27 resolution's directives by November 9. When the Cahns failed to do so, the University on November 9 notified various District of Columbia banks holding University funds that it had revoked the authority of its employees at the law school to dispose of any of these funds. On November 13 the Cahns filed suit against the University.[15] At a meeting of the law school Board of Governors on November 15, the Board resolved, by a vote of five to four, to support both the maintenance of the lawsuit and the Cahns' refusal to turn over law school funds to the University. Four days later the Board of Trustees adopted a resolution dissolving the Board of Governors. The Cahns were fired on January 11, 1980.

### III. The Issues on Appeal

#### A. *The Arguments of the Parties*

The Cahns present two arguments on appeal. First, they contend that the trial

---

13. The Urban Law Institute was described by the trial court as a "teaching law firm." It was founded in 1968 by Jean Camper Cahn as a graduate law program at George Washington University Law School. A few years later it became "an integral part of the Antioch School of Law."

14. On November 6 the funds in this account were transferred to another trustee account under Mr. Cummiskey's control in Grand Rapids, Michigan.

15. The Cahns testified that they believed this lawsuit to be authorized by the Board of Governors' resolution of September 23.

court erred, as a matter of law, in holding that they were not entitled to any back pay for the period remaining under their faculty contract after they were fired. Second, they argue that the University's failure to notify them by December 15, 1979, that they would not be reappointed resulted in the automatic renewal of their faculty contracts for another year. They contend that this notice deadline was established through custom and usage and that the trial court erred in holding that they were not entitled to receive any notice.

The University responds to these arguments by contending that the court erred in holding that the Cahns had faculty status in the first place. Specifically, the University argues that appellants were voluntary, part-time teachers who had no employment rights other than those afforded to them in their capacity as administrators. It further contends that appellants were not entitled to receive any notice of non-reappointment since they were not covered by the collective bargaining agreement, the relevant American Bar Association policies, or the 1973 annotated University personnel manual. Assuming *arguendo* that the Cahns enjoyed faculty status and that they were entitled to receive notice by December 15 that their faculty contracts would not be renewed, the University maintains that they received constructive notice during the hearings on the cross-motions for preliminary injunctions. Alternatively, it argues that the Cahns frustrated its ability to give notice by obtaining a temporary restraining order on November 13, 1979, which prohibited the University from interfering in the administrative affairs of the law school. That order remained in effect until January 11, 1980. Finally, the University contends that regardless of whether appellants were entitled to any notice of non-reappointment, they failed to introduce evidence of damages resulting from lost

faculty salary, and thus they should not be permitted to reopen the trial for that purpose.

In its cross-appeal, the University argues that the Cahns' actions amounted to a breach of their fiduciary duty towards it. The University contends that this breach caused it to incur $81,391 in legal fees and litigation-related expenses in connection with the Cahns' lawsuit which it should be permitted to recover under the bad-faith exception to the American rule on attorney's fees. The University maintains that appellants' bad faith was evidenced by their actions denying it control over tuition funds for several months, in derogation of its rights as owner of those funds, and requiring it to vindicate its rights through litigation. The Cahns respond to this contention by asserting that the legal advice they received, coupled with the directives from the law school Board of Governors, establish that all of their actions were undertaken in good faith.[16]

■ If a case is tried to the court, as this one was, we "may review both as to the facts and the law, but the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." D.C.Code § 17–305(a) (1981); *see, e.g., Hummel v. Koehler,* 458 A.2d 1187, 1191 (D.C.1983). This means that a trial court's findings of fact will not be disturbed unless they are clearly erroneous. *E.g., Auxier v. Kraisel,* 466 A.2d 416, 417 (D.C.1983); *see* Super.Ct.Civ.R. 52(a). The question before this court "is not whether [we] would have made the findings the trial court did, but whether 'on the entire evidence [we are] left with the definite and firm conviction that a mistake has been committed.'" *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123,

---

16. The Cahns also maintain that this claim was fully litigated and decided against the University in *In re Antioch University, supra.* This contention is without merit because there was no consolidation of a trial on the merits with the

hearing on the cross-motions for preliminary injunctions. Super.Ct.Civ.R. 65(a)(2); *see Washington Metropolitan Area Transit Authority v. L'Enfant Plaza Properties, Inc.,* 448 A.2d 864, 869–870 (D.C.1982).

89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1968) (citations omitted).

### B. *The Breach of Contract Claims*

The Cahns argue that the trial court erred in not awarding them their salary for the five and one-half months remaining under the faculty portion of their employment contract at the time they were fired as deans. Furthermore, they contend that the University's failure to notify them by December 15 that their faculty appointments would not be renewed entitled them to automatic reappointment for the 1980–1981 academic year, and that their right to receive such notice of non-reappointment was incorporated by custom and usage into their contract.[17]

The trial court found that, from the time of their appointment in 1971, the Cahns had "functioned" as members of the faculty[18] and that the University's Board of Trustees was aware of this. Thus the court concluded that, in addition to serving in their administrative capacities, they held separate and distinct positions as faculty members. It also ruled, however, that the Cahns were not entitled to any faculty salary for the five and one-half months remaining in the 1979–1980 academic year. The court explained:

> The compensation paid to the Cahns in the form of salary relates to the time element of the employment agreement. Conceptually, the [University] agreed to pay for services, at the monthly rate of $3,333.00 for each plaintiff, and the plaintiffs agreed to render services for that same period. The Court having found that the Cahns did not teach in the academic year 1979–80, that they were paid in their capacity as administrators and that they were properly terminated as

administrators on January 11, 1980, it follows that the plaintiffs have not suffered any damages from lost salary due to their improper termination as members of the faculty.

The Cahns argue that "the entire purpose of the dual-appointment system would be undermined if, as the court ... seems to have held, a dean's entitlement to return to full time teaching depends upon whether he happened to have taught a course during the last semester before the dean was terminated as an administrator." They contend that "[s]uch a principle would yield results that were purely fortuitous as evidenced by the fact that, in this case, had [they] been discharged in any other academic year they would have been entitled to backpay under the ... [c]ourt's reasoning." These contentions illustrate the inconsistency of the trial court's ruling, but that inconsistency is not fatal.

The Cahns' claim for lost salary is predicated on the terms of their employment contracts with the University. The evidence at trial showed that they were initially appointed to the positions of deans and professors of law but that their subsequent reappointments made no mention of their professorial status. Nevertheless, as the court found, appellants "functioned" as members of the faculty from the beginning. The critical question which the court had to determine was whether their appointments as deans and professors were divisible. As we observed in *Howard University v. Durham*, 408 A.2d 1216, 1219 (D.C.1979):

> There is no set answer to the question of when a contract is divisible and when it is entire.... There are merely suggested factors to be considered in resolv-

---

**17.** The Cahns are not asking to be reinstated to the faculty. Their arguments concerning reappointment are directed only to the amount of damages for lost salary.

**18.** Specifically, the court found that the Cahns functioned in all capacities that regular faculty members discharged: voting in faculty meetings, teaching classes, awarding credits,

supervising clinical work, supervising the internship program, serving as thesis advisers, carrying out appointments on faculty committees, participating in faculty evaluations, and having evaluation forms filled out by students whom they supervised in the clinic or taught in the classroom.

ing the issue. Consideration may be given to: (1) whether the parties assented to all the promises as a single whole ... (2) whether there was a single consideration covering various parts of the agreement or whether consideration was given for each part of the agreement ... and (3) whether performance of each party is divided into two or more parts, the number of parts due from each party being the agreed exchange for a corresponding part by the other party. [Citations omitted.]

The trial court apparently interpreted the contract to give the Cahns an option to act as professors, but a duty to act as deans. It does not necessarily follow, however, that the Cahns forfeited their right to salary as professors because they decided not to teach during the 1979–1980 year. If that decision is viewed as merely the exercise of an option, then the fact that they did not teach during that year was irrelevant. The court's denial of their claim for salary was nevertheless correct, but for a different reason: the Cahns did not prove what damages, in the form of lost faculty salary, they were entitled to receive.

■■ "It is clear in contract law that a plaintiff is not required to prove the amount of his damages precisely; however, the fact of damage and a reasonable estimate must be established." *W.G. Cornell Co. v. Ceramic Coating Co.*, 200 U.S.App. D.C. 126, 129, 626 F.2d 990, 993 (1980) (citations omitted); *see Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 549–550 (D.C. 1981). "While damages are not required to be proven with mathematical certainty, there must be some reasonable basis on which to estimate damages." *Romer v. District of Columbia*, 449 A.2d 1097, 1100 (D.C.1982) (citations omitted). Thus, "where a plaintiff proves a breach of a contractual duty he is entitled to damages; however, when he offers no proof of actual

damages or the proof is vague and speculative, he is entitled to no more than nominal damages." *Roth v. Speck*, 126 A.2d 153, 155 (D.C.1956) (footnote omitted); *see Mayor of New York v. Ransom*, 64 U.S. (23 How.) 487, 16 L.Ed. 515 (1859); 5 A. CORBIN, CONTRACTS § 1001 (1964).

■■ At the time of their discharge, the Cahns were being paid annual salaries of $40,000 each. On appeal they contend that a portion of this salary was paid to them as members of the faculty. In their trial brief, however, the Cahns stated that they sought "reinstatement to the law faculty with back pay at the rate of $40,000.00 a year each...." [19] Clearly, the evidence did not support the Cahns' implicit contention by this statement that they were being paid solely as faculty members and not as deans. On the other hand, they did not introduce any evidence, testimonial or documentary, that demonstrated what portion of their annual salary was attributable to their positions as faculty members. The Cahns argue in their reply brief that "the record ... contain[s] the collective bargaining agreement ... from which it is possible to determine the salary [they] would have received had they been employed solely as faculty members." At trial, however, they did not introduce the collective bargaining agreement for this purpose, but only to support their theory of what constituted timely notice of non-reappointment. The court, as trier of fact, was not required to delve *sua sponte* into other parts of the collective bargaining agreement in search of evidence on the issue of damages.

■■ A party claiming more than nominal damages on a breach of contract claim must not only introduce evidence on which a trier of fact may reasonably base an award; it must also draw the attention of the trier of fact to that evidence. It is not

---

**19.** In their brief the Cahns define back pay as "all sums due at the breach and all the sums that would have been due to the employee during the unexpired period of employment ...." D. DOBBS, REMEDIES § 12.25 (1973). They main-

tain that, at a minimum, they were entitled to faculty salary for the five and one-half months remaining under their contract at the time they were discharged.

enough to say that there is evidence in the record which, if closely scrutinized, could establish a basis for an award of damages. We will not fault the trial judge, especially in a case as complex as this one, for failing to discover on his own a tidbit of evidence, buried in a document introduced for another purpose, which neither party bothered to bring to his attention. We therefore hold that since the Cahns failed to show damages resulting from lost faculty salary, their claims must fail for lack of proof.[20]

## C. *The Breach of Fiduciary Duty Claims*

The University argues that as a consequence of the Cahns' breach of their fiduciary duties, it incurred litigation-related expenses totaling $81,391.24 and also suffered damages from the payment of $8,000 in unauthorized attorneys' fees by the Cahns to Messrs. Docter and Karr. We agree that the University is entitled to recover $8,000 from the Cahns for the unauthorized use of its monies, but we reject the University's claim for attorney's fees.

In denying the University's claims of breach of fiduciary duty by the Cahns, the court incorporated some of its earlier findings on the cross-motions for preliminary injunctions, including the following:

> The Co-Deans and Board of Governors have acted throughout this controversy out of a genuine concern for, and commitment to, the survival of the law school and the perpetuation of its service to clients and students. In their resistance of the University's demands, the Co-Deans and Board of Governors have acted in a good faith belief that they were bound to act as they did to discharge a serious fiduciary duty to the clients and students of the Antioch School of Law.

The court also found that the Cahns had retained the services of Charles Docter and John W. Karr "[i]n connection with the discharge of their fiduciary duty to the students and clients of the Antioch School of Law ... with full authorization of and actual knowledge by the Board of Governors...." The court then rejected the University's claims, stating:

> In view of the University's responsibility for ambiguities that were permitted to exist regarding the relationship of the ·law school to Antioch University and the Court's findings that the Cahns owed a fiduciary duty to the clients and students of the school of law and that the Cahns' initiation of the action against the University and retention of Charles Docter, Esquire and John W. Karr, Esquire was a good faith exercise of that duty, the Court concludes that the University has not sustained its burden of proving by a preponderance of the evidence that the Cahns breached a fiduciary duty to the University. Accordingly, the University is not entitled to an award of damages on these claims.

In so ruling the court erred. The Cahns owed a fiduciary duty not to the students and clients of the law school, but to the University which paid their salaries.

The legal relationship between the University and the Cahns was that of employer and employee, or principal and agent. An agency has been defined as

> the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.

RESTATEMENT (SECOND) OF AGENCY § 1 (1958). This relation "implies that the principal has reposed some trust or confidence in the agent, and the agent or employee is bound to the exercise of the utmost good

---

**20.** The Cahns also contend that because the court erroneously precluded a back pay award, they were denied an opportunity to produce such evidence. This argument places the cart before the horse. It was incumbent on the Cahns to place affirmative evidence of damages before the trial court as part of their case in chief. The fact that the court later ruled, on other grounds, that the Cahns were not entitled to any back pay at all does not excuse their failure at trial to offer proof of damages.

faith, loyalty, and honesty toward his principal or employer." 3 AM.JUR.2D *Agency* § 199 (1962) (footnotes omitted).

In their roles as deans and provosts of the law school, the Cahns were entrusted with, and given access to, University funds. In managing these funds, they owed a fiduciary duty to the University. *See generally* RESTATEMENT, *supra*, § 14B comment b; 3 AM.JUR.2D *Agency* § 211 (1962).[21] They had ample reason to be concerned about the adverse effect that the University's possible declaration of bankruptcy might have on funds the law school received from grants and contracts with federal agencies.[22] This concern, however, did not cloak them with fiduciary responsibilities toward the law school's students and clients. Notwithstanding the harmful repercussions which a bankruptcy filing might have had on the law school as an entity, the Cahns' only fiduciary obligations were to the University. It was the University, not the law school, which hired the Cahns.

Furthermore, the record supports the trial court's findings that, despite the "substantial functional autonomy" which the University's constituent units had, the "ultimate authority for fiscal affairs at the law school [had] always been vested in the Board of Trustees ...." [23] Although the law school Board of Governors enjoyed

substantial autonomy from the central administration in academic, administrative, and fiscal matters, the routine practice before the May 1979 financial crisis was to transfer most restricted funds received from federal grants for use in connection with the law school to the University's central offices in Ohio. When the University found itself confronted with virtual insolvency in May and June, it imposed further stringencies on the expenditure of funds and required regular weekly accounting by all of its units. In flagrant violation of these restrictions, and without University authorization, the Cahns spent $8,000 from University funds in seeking legal advice from attorneys Docter and Karr. Their expenditure of this money was a breach of their fiduciary duty to the University.[24] The court's finding that, in doing so, they acted in good faith is irrelevant, for good faith is not a defense to a claim for damages based on a breach of fiduciary duty. *See* G. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 543, at 216–219 (2d ed. 1978). The University is thus entitled to recover the $8,000 from the Cahns.

The University is not entitled, however, to recover damages for the litigation expenses it incurred in regaining control of its assets. "It has long been established in American jurisprudence that attor-

---

**21.** In its order granting the University's motion for a preliminary injunction, the court found that the Cahns "concede[d] that legal title to all assets of the law school [was] vested in the University, with the Management of those assets entrusted to the Board of Trustees."

**22.** The court found that the "law school relie[d] heavily on grants and contracts from federal agencies to finance its operations."

**23.** The trial court specifically found:

The corporate charter of Antioch University, Inc., vests responsibility for all property of the University in the University's Board of Trustees. The University has, in its accounts, consistently treated assets, liabilities, revenues, and expenditures of the school of law as belonging to the University.

**24.** Indeed, the record contains evidence that the Cahns had been previously warned by President Birenbaum not to retain independent counsel

when transacting business on behalf of the law school. In 1977 the Cahns had retained counsel in negotiating a lease for the Warder Totten Building, which was owned by the University. When President Birenbaum received notification of this action, he wrote to Edgar Cahn:

You are an employee of Antioch [University] and an officer thereof, subordinate to the President. The budgets of the [University] are transacted through a process wholly internal to the [University], as you are well aware.

I see no need for, and indeed believe it is not appropriate for, a Provost to retain legal counsel in behalf of an integral unit of the [University] in the transaction of his administrative relationships with the President of the [University], who represents the Board and is the Chief Administrative Officer of the whole including all integral parts.

ney's fees are not ordinarily recoverable by a prevailing litigant unless a statute or a contract specifically provides for an award of such fees." *Washburn v. Washburn,* 475 A.2d 410, 413 (D.C.1984) (citations omitted). There are a few narrow exceptions to this rule. For example, "where a party brings or maintains an unfounded suit or withholds action to which the opposing party is patently entitled, as by virtue of a judgment or because of a fiduciary relationship, and does so in bad faith, vexatiously, wantonly, or for oppressive reasons, reasonable attorney's fees may be allowed." *1901 Wyoming Avenue Cooperative Ass'n v. Lee,* 345 A.2d 456, 464–465 (D.C.1975) (citation and footnote omitted); *accord, F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974). This is the exception on which the University bases its claim for repayment of the $81,391 it spent for legal fees and related expenses.

Fiduciary duty does not bar an agent from suing his principal, as the Cahns did here, to resolve a legitimate dispute over the nature of their relationship. Thus it is the American rule on attorney's fees, not the more narrowly drawn rules of fiduciary law, which governs this aspect of the case. Under the exception to the American rule on which the University relies, good faith is a defense; indeed, the University must affirmatively show that the Cahns acted in bad faith before it can prevail on this claim. Given the trial court's findings, the University cannot do so. However, misguided or misdirected the Cahns' attempts to protect the law school may have been, the trial court, after considering all the evidence, found that they had "acted ... out of a genuine concern for, and commitment to, the survival of the law school and the perpetuation of its service to clients and students." There was evidence to support this finding; hence it was not clearly erroneous.

25. The University also asks us to reverse the trial court's order awarding the Cahns $1,119.28 for lost fringe benefits because they were employed as administrators, not as faculty members with contractual rights. Having concluded that the trial court's finding that the Cahns held a dual status was not clearly erroneous, we must reject this contention also.

We therefore hold that the University cannot recover the $81,391.[25]

## IV. CONCLUSION

We affirm the judgment of the trial court except to the extent that it denied the University's claim against the Cahns for $8,000 in damages for breach of their fiduciary duty. The case is remanded to the trial court with directions to amend its judgment as to that one claim by awarding the University $8,000 in damages, plus such interest and costs as the law may permit. The judgment shall otherwise remain unchanged.

*Affirmed in part, reversed in part, and remanded.*