**Billie R. SCHLANK, Appellant,**

v.

**Katherine A. WILLIAMS, et al., Appellees.**

**No. 88–1295.**

District of Columbia Court of Appeals.

Argued Dec. 14, 1989.

Decided March 22, 1990.

---

Sheldon I. Cohen, Arlington, Va., for appellant.

James C. McKay, Jr., Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellees.

Before STEADMAN, SCHWELB, and FARRELL, Associate Judges.

FARRELL, Associate Judge:

This is an appeal from a grant of summary judgment on one count of a five count complaint in favor of appellee Katherine A. Williams, Acting Administrator of the Rehabilitation Services Administration of the District of Columbia Department of Human Services (RSA). The appellant, Ms. Billie R. Schlank (Schlank), is a blind vendor operating a vending stand in the District of Columbia pursuant to the Randolph–Sheppard Act, as amended (the "Act"), 20 U.S.C. §§ 107 to 107f (1982), and its implementing regulations, 34 C.F.R. §§ 395.1 to 395.38 (1988). She contends that the Superior Court erred as a matter of law in concluding that the Act prohibits a blind vendor from deducting legal expenses incurred in the operation of her stand when calculating her net monthly profits. Such a deduction would have a significant effect on Schlank's income since all participating vendors are assessed a monthly administrative levy by RSA based upon a percentage of their net profits. Once collected, this levy goes into a general fund for the benefit of all blind vendors.

Schlank also appeals from an order denying her motion for attorneys' fees incurred in her administrative dealings with RSA and in this litigation. She contends that the Act allows for the recovery of attorneys' fees or, in the alternative, that such fees are warranted by RSA's history of bad faith or oppressive conduct in dealing with her both before and during the litigation.

We affirm the judgment and order of the trial court.

I.

The Randolph–Sheppard Act was passed "[f]or the purposes of providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting." 20 U.S.C. § 107(a). The program is administered on the federal level by the Rehabilitation Services Administration of the Department of Education (DOE), 20 U.S.C. § 107a(a)(1), which desig-

nates state agencies to run the program on the local level. *Id.* at § 107a(a)(5); 34 C.F.R. § 395.2. RSA is the agency which administers the program in the District of Columbia. The state agency then licenses eligible blind persons who are authorized to operate vending facilities on federal property. *Id.;* 34 C.F.R. § 395.7.

The state agency is also responsible for the administrative functions involved in overseeing the program, including the collection of an administrative levy from each vendor based upon a percentage of net monthly proceeds.[1] This levy is then placed in a general fund for the benefit of all licensed vendors. In its application to DOE for designation as the state licensing agency, the state agency agrees, *inter alia,* that any funds set aside from vendors' net proceeds may be used only for the purposes of "(A) maintenance and replacement of equipment; (B) the purchase of new equipment; (C) management services; (D) assuring a fair minimum return to operators of vending facilities; and (E) retirement or pension funds, health insurance, and provision for paid sick leave and vacation time, if it is determined by a majority vote of blind licensees ... that funds under this paragraph shall be set aside for such purposes." 20 U.S.C. § 107b(3); 34 C.F.R. § 395.9.[2] The state agency also agrees to provide written procedures by which a blind vendor dissatisfied with any action taken by the agency in administering the program may obtain a full evidentiary

hearing at the state level, and to submit grievances not otherwise resolved to DOE for arbitration. 20 U.S.C. § 107b(6); 34 C.F.R. § 395.13(a).[3] At the time of the proceedings in this case, RSA had established no such procedures in the District of Columbia.

Section 107d–3(a) of the Act provides that any income derived from the operation of vending machines on federal property shall be distributed to vendors operating facilities on that property[4] or, if there are no vendors operating facilities on the property, to the state agency to be used for the benefit of all licensees.

## II.

Schlank was licensed as a blind vendor in 1976 and was assigned to operate a vending facility in the State Department building in February of 1977. Her disputes with RSA began shortly thereafter.

In mid–1977 Schlank complained to William W. Thompson, the coordinator of RSA's vending facility program, that she was not receiving the income from vending machines in the building to which she was entitled under section 107d–3(a) of the Act and that RSA was not making a sufficient effort to collect this income. Although Thompson responded that he was attempting to resolve the situation through negotiation with federal officials, Schlank was dissatisfied with these efforts.[5] She there-

1. The state agency may assume these functions on its own or may enter a written agreement "whereby another agency or organization undertakes to furnish services to blind vendors." 34 C.F.R. § 395.15(a).

2. In no event, however, "shall the amount of such funds to be set aside from the net proceeds of any vending facility exceed a reasonable amount which shall be determined by the Secretary." 20 U.S.C. § 107b (3).

3. 20 U.S.C. § 107d–1 (a) provides that a licensee dissatisfied with the outcome of a state evidentiary hearing may file a complaint with the Secretary of DOE, who "shall convene an arbitration panel to arbitrate the dispute." The complaint must be accompanied by supporting documents including the decision rendered at the state evidentiary hearing. 34 C.F.R. § 395.13(a). Similarly, 20 U.S.C. § 107d–1(b) provides that a state agency which determines

that any instrumentality of the federal government having control over federal property is failing to comply with the Act may file a complaint with the Secretary of DOE, who shall convene a panel to arbitrate the dispute.

4. DOE is authorized, however, to impose a ceiling on the amount of income a licensee may receive from this source. Any excess goes to the state agency. 20 U.S.C. § 107d–3(a). This limitation on income does not apply where the machines are maintained, serviced, or operated by the licensee, nor does it apply if the machines are in "direct competition" with a vending facility. *Id.* § 107d–3(b).

5. 34 C.F.R. § 395.32(a) provides that the on-site federal official responsible for the administration of the program shall collect and account for vending machine income. A percentage of that income is then to be collected by the state

fore sought a full evidentiary hearing as provided by the Act. Since RSA had failed to promulgate rules for such hearings, a hearing was held under the auspices of the Fair Hearings Division of the Department of Human Resources. *See* D.C.Code §§ 3–210.1 to 210.19 (1988). After a decision in her favor in May of 1978, however, Schlank received a letter from the chief of the Fair Hearings Division stating that it was without jurisdiction to hear the dispute and thus the decision was not binding or enforceable. Schlank was later told by RSA that she and the other vendor in the State Department building would both receive their proper shares of the vending machine income. This apparently resolved the issue.

In June of 1983, Schlank requested permission from RSA to service and stock vending machines in the State Department building. RSA denied this request on July 5, 1984, based in part upon a new RSA regulation or "program instruction" establishing criteria for vendors wishing to service vending machines. In order to qualify, vendors were required to achieve a certain percentage of gross and net profits from the operation of their vending facilities; these percentages varied depending on the classification of the facility. Schlank's facility was classified as a "snack-bar" and she was unable to meet the applicable percentages. The same criteria were used in determining eligibility for promotions and transfers. Schlank perceived that, under these criteria, only she and the other vendor in the building were excluded from servicing vending machines or being considered for promotion, and that she had been singled out for harassment because of her outspokenness.[6]

Schlank was also involved in a dispute with RSA regarding the right of a blind vendor to incorporate. Despite opinions from DOE that the Act did not prohibit incorporation, RSA threatened Schlank with revocation of her license should she do so. In addition, beginning in 1984 Schlank deducted her legal costs as a business expense from her monthly levy by RSA. The agency questioned whether this was a proper deduction, sought advice from DOE on the subject, and ultimately informed Schlank that it would bill her for "unauthorized" deductions.[7]

On February 15, 1985, Schlank filed a five count complaint in Superior Court against Katherine Williams, the acting administrator of RSA, seeking declaratory and injunctive relief.[8] In count one, Schlank sought a declaratory judgment that RSA had denied her application to service vending machines in the State Department building on the basis of arbitrary and capricious regulations. She further alleged that these regulations were without legal effect because they had not been promulgated in accordance with the District of Columbia Administrative Procedure Act. *See* D.C.Code § 1–1501 (1987). Count two made the same contentions with regard to RSA's regulations governing promotion and transfer opportunities. In count three, Schlank sought a declaratory judgment regarding her right to deduct her legal fees as an operating expense from the monthly administrative levy on her net proceeds. In counts four and five she sought a declaratory judgment or order allowing her to incorporate or, in the alternative, an exemption from and/or a refund of District of Columbia Business Franchise

---

licensing agency for distribution to the individual vendors. The percentage distributed to the state agency depends on whether or not the machines are determined to be in direct competition with a vending facility operated by a blind vendor. *Id.* § 395.32(a)–(e).

6. In an earlier incident, on March 28, 1984, Schlank's license had been suspended after RSA received complaints regarding her sale of Playboy and Hustler magazine. Her license was reinstated in April after Schlank threatened legal action.

7. Schlank was actually informed of this decision by District Enterprises for the Blind (DEB), a nonprofit corporation with whom RSA had contracted to furnish management services to the blind. *See* note 1, *supra.*

8. Schlank's motion to maintain her suit as a class action was denied on November 15, 1985, by Judge Revercomb.

taxes already paid. The parties filed cross-motions for summary judgment.

In a July 16, 1987 order Judge Wagner granted, in part, Schlank's motion for summary judgment and denied that of RSA.[9] With regard to counts one and two, Judge Wagner found that the program instructions establishing new eligibility requirements for vendors wishing to service vending machines and for transfers and promotions constituted new rules that had not properly been promulgated, and so were without legal effect.[10] Judge Wagner denied summary judgment on count three, reserving for trial the issue of whether legal expenses are deductible when computing a vendor's net proceeds. With regard to incorporation, the judge concluded that neither the Act nor any regulation prohibits a vendor from incorporating, and that RSA could not revoke or threaten to revoke Schlank's license for this action. Finally, count five was certified to the Tax Division of the Superior Court for resolution.[11]

On November 16, 1987, Schlank filed a motion for attorneys' fees. The motion was denied by Judge Kessler in a March 9, 1988 order on the ground that the Act makes no provision for attorneys' fees and thus, under the "American Rule", the court was without authority to award them. Although unimpressed by RSA's cooperativeness in dealing with Schlank, Judge Kessler further rejected the argument that RSA's conduct amounted to bad faith or vexatiousness necessary to invoke the court's inherent power to award attorneys' fees.

The case was subsequently reassigned to Judge Weisberg who, at a February 8, 1988 status conference, directed that the parties file cross-motions for summary judgment on the deductibility issue in count three, the only remaining count. In a May 31, 1988 order Judge Weisberg granted RSA's motion for summary judgment on the ground that DOE's and RSA's interpretation of the Act as prohibiting the deduction of legal expenses from a vendor's net proceeds was reasonable in light of the purposes of the Act.

In an order dated August 30, 1988, the court entered final judgment incorporating the orders of Judges Wagner, Kessler, and Weisberg. Schlank now appeals from Judge Weisberg's order holding that legal fees are not deductible as a business expense under the Act, and from Judge Kessler's order denying her motion for attorneys' fees.

### III.

#### A. Deductibility of Legal Expenses

A blind vendor's net proceeds from the operation of a vending facility are used as a basis for determining the amount of the administrative levy each vendor is assessed. 20 U.S.C. § 107b(3). Although not

---

9. As a preliminary matter, Judge Wagner considered and rejected the Corporation Counsel's argument that Schlank had failed to exhaust her administrative remedies. Judge Wagner concluded that, under the circumstances of this case, any resort to administrative remedies would have been futile and was therefore excused. Although the Act provides for resolution of disputes in the first instance by resort to a full evidentiary hearing at the state level and, if necessary, by arbitration before DOE, Judge Wagner found that RSA had failed properly to adopt any procedures for the conduct of such hearings; there were, therefore, no administrative remedies available. In addition, she concluded that pursuant to § 107b(6) of the Act, DOE was not required to convene an arbitration panel where there had been no prior proceedings before the state agency. See Committee of Blind Vendors of the District of Columbia v. District of Columbia, 695 F.Supp. 1234, 1240

(D.D.C.1988) (district court refers to letter from DOE commissioner expressing opinion that, until the District of Columbia promulgates hearing procedures, DOE will decline to entertain arbitration requests). Finally, Judge Wagner rejected the argument that Schlank could have sought a hearing before the District of Columbia Office of Fair Hearings.

10. The judge reserved for trial the issue of whether "other valid reasons exist for denying plaintiff an opportunity to service vending machines," noting that RSA maintained that space problems and the fact that Schlank and another had filed a joint application necessitated the denial. Before the issue could be tried, however, the parties jointly moved for entry of final judgment. See p. 26, infra.

11. This issue was ultimately settled by a compromise agreement filed with the Tax Division.

defined in the Act, "net proceeds" are defined by regulations as "the amount remaining from the sale of articles or services of vending facilities, and any vending machine or other income accruing to blind venders after deducting the cost of such sale *and other expenses....*" 34 C.F.R. § 395.1(k) (emphasis added).

In a 1984 letter responding to an inquiry from RSA as to whether these "other" deductible expenses included local taxes and legal fees incurred by a vendor in operating a vending facility, the regional commissioner of the Rehabilitation Services Administration of DOE, Ralph N. Pacinelli, interpreted the regulations as prohibiting the deduction of legal fees. Pacinelli stated:

> With regard to the use of gross profit to pay business taxes and legal fees, we provide the following understanding. The D.C. Unincorporated Business Franchise Tax is a required business tax which all vendors must pay to maintain their vending facility operations. Therefore, it seems appropriate that such a tax would be covered under the guide for deducting operating expenses, as outlined in the instructions for completing [form] RSA–15.... Pursuant to the above clarification, it appears that legal fees would not be considered required operating expense [sic], and therefore could not be charged against gross income. Legal fees acquired by a vendor as a result of a grievance are considered a personal expense and thus the payment should appropriately be the vendor's responsibility.

In making this determination, the Commissioner relied in part on previously issued instructions for completing form RSA–15.[12] These instructions stated that the operating expenses to be deducted from gross income

> should include but not be limited to non-reimbursed expenditures by the vendor for state approved purchases of equipment, repairs and maintenance of equip-

ment; merchandise and supplies; wages to stand assistants or relief operators; rent; utilities; various kinds of insurance such as public liability, theft, fire, social security, and workmen's compensation; extermination or pest control services; delivery services; business licenses; state and local taxes and janitorial services.

Based upon this interpretation of legal fees as "personal expenses," RSA refused to allow Schlank to deduct her legal fees as an operating expense.

In her motion for summary judgment, Schlank contended that the fees were incurred to protect her license and while litigating her rights to certain income and business opportunities; they therefore were necessary business expenses which, under basic and normally accepted accounting principles, should be deductible when determining gross and net profits. Since she had been forced to seek legal protection in order to preserve her business interests, she argued, her expenses could not properly be considered "personal".

While acknowledging that Schlank's arguments had force, Judge Weisberg concluded that the agency's less liberal reading of the statute was at least as persuasive, and so he deferred to what he considered a reasonable interpretation of the Act by an agency charged with its administration. In so doing, the judge agreed with the agency's argument that if Schlank's interpretation were adopted, it would favor vendors who freely resort to litigation "seeking to vindicate what they believe to be their legal rights, to the possible detriment of all other vendors who would, in effect, be forced to subsidize these activities...." The judge therefore concluded that the agency could fairly characterize legal fees as personal expenditures not deductible as a business expense in computing the net proceeds subject to levy.

 In *Chevron, U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S.

---

**12.** Form RSA–15 is an annual survey of concession and vending opportunities available to blind persons under the Act which state agencies are required to complete on a yearly basis. *See* 20 U.S.C. § 107b(4); 34 C.F.R. § 395.38.

837, 843–44, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984), the Supreme Court held that where an administrative agency has construed a statute with regard to an issue upon which Congress has not spoken, the only question for a reviewing court is whether that interpretation reflects a permissible and reasonable construction of the statute. "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the one the court would have reached if the question had arisen in a judicial proceeding." *Id.* at 843 n. 11, 104 S.Ct. at 2783 n. 11. This court follows the same principle. *E.g., Superior Beverages, Inc. v. District of Columbia Alcoholic Beverages Control Board,* 567 A.2d 1319 (D.C.1989) (this court "should defer to any reasonable construction of a statute even if our interpretation would be different"); *District of Columbia Dep't of Corrections v. Teamsters Local No. 246,* 554 A.2d 319, 323 (D.C.1989) (court will defer to a reasonable interpretation of a statute by an agency charged with its enforcement if the reading is not inconsistent with the statute itself); *Hager v. District of Columbia Dep't of Consumer and Regulatory Affairs,* 475 A.2d 367, 368 (D.C. 1984) (same). Thus, the court's role is not to substitute its construction of the statute for that of DOE and followed by RSA, but to determine whether, in the context of the Randolph–Sheppard program, that interpretation was a reasonable one. We conclude that it was.

On appeal Schlank relies primarily on the argument that, since it is "black letter law" that legal fees incurred by a *taxpayer* in the course of operating a business are deductible business expenses for both federal and state taxation purposes, *see* 26 U.S.C. § 162(a) (1988); D.C.Code § 47–1803.3(a)(1) (1987), it was unreasonable for RSA to deny her the same deduction for the purposes of the administrative levy.[13] In con-

struing the Act, however, neither DOE nor RSA was bound by the normal classification of legal expenses for taxation purposes.[14] They were free to reach a different result that was reasonable and consistent with the Act itself.

The administrative levy assessed against the net proceeds of vendor sales is very different from an ordinary tax. The levy is placed into a fund for the exclusive benefit of participating vendors, including appellant, where it is used for such things as health insurance, paid sick leave, vacation time and a guaranteed minimum income to operators of vending facilities. 20 U.S.C. § 107b(3). As structured by the Act, the levy is an accommodation between a key purpose of the Act of "stimulating the blind to greater efforts in striving to make themselves selfsupporting," 20 U.S.C. § 107(a), and a recognition that in important respects the unsighted vendor still requires a governmental "safety net." Hence, for example, while levied funds *must* be set aside to subsidize needy vendors (to "[a]ssur[e] a fair minimum of return to vendors"), they *may* be set aside for items such as pension funds, health insurance, and paid vacation time only if a majority of the licensed vendors so agree. *See* 34 C.F.R. § 395.9(b). This delicate balance in the Act between vendor autonomy and residual dependency on government support demonstrates that the levy serves purposes quite distinct from a general tax assessment, and so its collection without allowance for deduction of legal expenses is not, as appellant maintains, a penalty against vendors who assert self-sufficiency by pursuing their legal rights. Schlank may be correct that her struggle with the agency has yielded results beneficial ultimately to all licensed vendors, but we cannot hold unreasonable the agency's conclusion that deductibility of expenses that in the main are a matter of personal choice

---

**13.** Although appellant appears to argue initially that "the intent of Congress is clear" in supporting her interpretation, she provides no support for this contention nor can we find any. Neither the plain language nor anything in the legislative history unambiguously answers the question presented.

**14.** Of course, nothing in the Act prevents Schlank or any other blind vendor from deducting legal fees as a business expense on their federal and District of Columbia tax returns.

and not incurred by all vendors would risk depleting the fund at the expense of the beneficiary class in general.[15]

Because DOE's interpretation of the Act and regulations and RSA's reliance on that interpretation were reasonable and consistent with the Act itself, *District of Columbia Dep't of Corrections v. Teamsters Local No. 246, supra*, 554 A.2d at 323, we must affirm the grant of summary judgment.

### B. Attorneys' Fees

■ Generally, under the "American Rule," absent express statutory authorization or a contractual provision, each party is responsible for its own attorneys' fees. *Synanon Foundation, Inc. v. Bernstein*, 517 A.2d 28, 35 (D.C.1986); *Trilon Plaza Co. v. Allstate Leasing Corp.*, 399 A.2d 34, 37 (D.C.1979); *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 254–57, 95 S.Ct. 1612, 1620–21, 44 L.Ed.2d 141 (1975). Unless the legislature has made "specific and explicit provisions for the allowance of attorneys' fees," *Alyeska*, 421 U.S. at 260, 95 S.Ct. at 1623, or there is "clear support" in the language or legislative history of a statute for such an intent, *Summit Valley Industries, Inc. v. Local 112, United Bhd. of Carpenters and Joiners of America*, 456 U.S. 717, 726, 102 S.Ct. 2112, 2117, 72 L.Ed.2d 511 (1982), no statutory basis for an award of attorneys' fees exists.

■ There are, at the same time, several recognized exceptions to the American Rule, one of which is claimed to be relevant here. As a matter of inherent equitable authority, a court may award attorneys' fees when the other party "has 'acted in bad faith, vexatiously, wantonly, or for op-

pressive reasons.'" *Alyeska, supra*, 421 U.S. at 258–59, 95 S.Ct. at 1622–23 (quoting *F.D. Rich Co. v. United States*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974)); *Synanon, supra*, 517 A.2d at 36–37. The intent of this exception is not to compensate worthy litigants but to " 'deter abusive litigation in the future, thereby avoiding harassment and protecting the integrity of the judicial process.'" *Synanon, supra*, 517 A.2d at 37 (citation omitted). Consistent with its purpose, however, the exception "applies only in extraordinary cases," *Launay v. Launay*, 497 A.2d 443, 450 (D.C.1985); *Andrews v. District of Columbia*, 443 A.2d 566, 569 (D.C.), *cert. denied*, 459 U.S. 909, 103 S.Ct. 216, 74 L.Ed.2d 172 (1982), "or when dominating reasons of fairness so demand." *Synanon, supra*, 517 A.2d at 37.

Appellant seeks attorneys' fees under both the Randolph–Sheppard Act and the bad faith exception.

#### 1. Statutory entitlement to fees

■ Appellant asserts that the Randolph–Sheppard Act itself contemplates an award of attorneys' fees to a vendor wronged by state agency action. As Judge Kessler correctly pointed out, however, the Act "simply does not provide anywhere in its language for the award of counsel fees." Nor has appellant pointed to legislative history manifesting a clear intent of Congress to allow for fees. Instead, appellant relies exclusively on federal appellate decisions, chief of which is *Delaware Dep't of Health and Social Services v. United States Dep't of Educ.*, 772 F.2d 1123 (3d Cir.1985), in which the court upheld an

---

**15.** In his letter to RSA, Commissioner Pacinelli expressed the view that since the D.C. Unincorporated Business Franchise Tax was "a required business tax, ... it seems appropriate that [it] would be covered under the guide for deducting operating expenses...." Legal fees, by contrast, were not a "required" operating expense and could not be charged against gross income. Schlank erroneously interprets this to mean that, in DOE's view, an operating expense, to be deductible, must be one required by law. If this were true, Schlank would be correct that the agency's interpretation is internally inconsist-

ent, since many of the deductible expenses listed in the instructions for completing form RSA–15 —such as janitorial services—are not required by law. We conclude, however, that Pacinelli's use of the word "required" referred to those expenses necessary to keep a business running on a day-to-day basis, and not merely to expenses required by law. The refusal to allow a deduction for legal expenses, therefore, is not inconsistent with Pacinelli's interpretation, nor is the classification of legal fees as "personal" unreasonable when compared to those business expenses listed.

arbitration panel's award of attorneys' fees against the state of Delaware.

In *Delaware* a vendor licensed under the Act, having been passed over for appointment to a management position in violation of a state regulation, requested and received a full evidentiary hearing before a state hearing examiner. *Id.* at 1132. The examiner ordered that the vendor be appointed to the management position and awarded him a portion of his legal fees but disallowed $1,254 of those expenses. *Id.* An arbitration panel convened by DOE then awarded the vendor the $1,254 disallowed by the state examiner. *Id.* at 1134. On appeal from the arbitrator's decision, the district court overturned the arbitrator's award on the ground that it contravened the American Rule. *See Delaware Dep't of Health and Social Services v. United States Dep't of Educ.,* 592 F.Supp. 1038 (D. Del.1984). The court of appeals reversed. Although the court endeavored to narrow the scope of the question before it to "whether the arbitrators, who concluded that the $1,254 request was reasonable, acted arbitrarily, or capriciously, abused their discretion, or committed legal error in holding that the additional fees should be awarded," *Delaware, supra,* 772 F.2d at 1138, it nevertheless held broadly that an award of attorneys' fees is appropriate under the Randolph–Sheppard Act as an element of compensatory damages for breach of contract. *Id.* at 1139. The court reasoned that by undertaking to administer the Randolph–Sheppard program on the state level and agreeing to cooperate with DOE in carrying out the purposes of the Act, *see* 20 U.S.C. § 107b(1), a state enters a contractual relationship with the federal government to which licensed vendors are third-party beneficiaries. While acknowledging that the attorneys' fee question was "a close one," the court concluded:

> [T]he overall scheme strongly suggests that the states must undertake *to make blind vendors whole* for breaches of the contractual obligations imposed on them by virtue of participation in the Federal Blind Vendors Program.... [A]n award of attorneys' fees as contract damages is, in this unique circumstance, an appro-

priate means to that end. Delaware has not met its burden of showing that the broad *make-whole* powers of the arbitration panel in this contractual situation did not include the power to award such fees.

*Id.* at 1139–40 (footnote omitted; emphasis added).

Appellant contends that although the fees at issue in *Delaware* were incurred during a state-level administrative hearing, the same rationale applies to her suit in Superior Court. RSA's failure to adopt procedures for full evidentiary hearings, she argues, *see* note 9, *supra,* left her with no alternative but to bring this action in Superior Court, which was the equivalent of both the hearing and the DOE arbitration that had been denied her by RSA. Thus, under the rationale of *Delaware,* the trial court was free to fashion a remedy that included reasonable attorneys' fees.

Judge Kessler rejected this argument and distinguished. *Delaware* on the ground that, since the issue of statutory authority for a fee award was not contested there, the court never decided the issue of whether the Act allows for an award of attorneys' fees. The judge also recognized, however, quoting the Third Circuit's opinion, that the question "the court did deal with was 'whether, as a matter of federal law, attorneys' fees are an appropriate element of damages for breach of contract between a blind vendor and a Randolph–Sheppard state licensing agency.'" In reversing the district court, the court in *Delaware* expressly held that an award of attorneys' fees against state agencies is proper under the Randolph–Sheppard Act as part of a "make-whole" remedy for "breaches of contractual obligations imposed on them by virtue of participation in the Federal Blind Vendors Program." *Delaware, supra,* 772 F.2d at 1139. Thus it is problematical, at least, to say that the court never considered whether fees could be awarded under the Act.

Nevertheless, we agree with Judge Kessler that the differences between *Delaware* and this case are significant. At bottom the court in *Delaware* ruled as it did be-

cause it could find nothing in the history of the Act revealing an intent to limit the traditionally "broad make-whole powers of [an] arbitration panel" under federal law. *Id.* at 1140.[16] Only by analogy can the proceedings in Superior Court in this case be said to have mirrored the arbitration panel's decision in *Delaware.* Even if the parallel were exact, however, we would decline to follow the result reached in that case for the following reason.

In *F.D. Rich Co. v. United States, supra,* the Supreme Court, in denying an award of attorneys' fees, recognized the logic that unless fees are awarded the "party who must bear the costs of his attorneys' fees out of this recovery is not made whole." *Id.* at 129. Notwithstanding this fact, in the absence of express language or clear evidence of congressional intent, the Court declined to read the Miller Act, 40 U.S.C. §§ 270a *et seq.,* as permitting an award of attorneys' fees. Similarly, in *Summit Valley Industries, Inc. v. Local 112, supra,* the Court assumed for argument's sake that "Congress plainly intended Section 303 [of the Labor Management Relations Act] to be *fully* remedial and to restore to the victimized employer *all … losses*" (emphasis by Court), but held that "this justification is not sufficient to create an exception to the American Rule in the absence of express congressional authority." *Id.* The conclusion seems

inescapable, therefore, that the Supreme Court has rejected the same argument of a "make-whole" remedy implicit in a statute otherwise silent on the fee issue that persuaded the *Delaware* court to sustain an award of attorneys' fees under the Act.[17] Judge Kessler correctly found that there is no statutory basis for an award of attorneys' fees in this case.[18]

2. The bad faith exception

■ Appellant also argued to the trial court that attorneys' fees were appropriate because of RSA's bad faith and oppressive conduct both before and during the litigation. Judge Kessler took note of appellant's claim that "the long and convoluted history of this lawsuit and events leading up to its filing establish the obduracy and bad faith which would provide justification … for an award of counsel fees," but stated nevertheless:

> While the Defendants have not been a model of timely bureaucratic action, and while they have not demonstrated any great eagerness to accommodate the claims of the Plaintiff, the Court does not find that their conduct—and specifically their post-litigation conduct—rises to the level of vexatiousness or bad faith which must be shown to justify an award of attorneys fees under this exception to the American Rule. In short the court cannot conclude that the claims and liti-

16. *See, e.g., Delaware, supra,* 772 F.2d at 1130 ("No witness in hearings on S. 2581, and no member of Congress ever suggested that the scope of relief which could be awarded in … arbitration proceedings [under the Act] was in any degree different than that available in other arbitration proceedings").

17. Although the court in *Delaware* noted that it was dealing with an award of fees compensating not for costs in an arbitration proceeding, but rather for costs at the state hearing level, it cited a written DOE policy purportedly construing 20 U.S.C. § 107d–2(d) (which requires DOE to pay "all reasonable costs to arbitration") so as to require the Secretary to pay attorneys' fees in arbitration proceedings for a vendor unable to afford them. 772 F.2d at 1138 n. 13. We have examined that policy ("Revised Interim Policies and Procedures for Convening and Conducting an Arbitration Pursuant to Sections 5(b) and 6 of the Randolph–Sheppard Act as Amended," dated February 3, 1978), and by its terms it

appears to hold the very opposite. Two versions of the Revised Interim Policies are extant, both issued the same date. One contains a provision, ¶ 16(e), permitting payment of reasonable fees for legal expenses in the arbitration proceeding, but it is lined through as deleted. The second version, obviously reflecting the deletion, contains no paragraph 16(e) and no provision for legal expenses. Evidently for this reason, appellant does not rely on any such policy directive of DOE or the "costs" provision of the Act, § 107d–2(d), but rather on the make-whole remedy which the Third Circuit found implicit in the Act.

18. Judge Kessler also accurately distinguished *Almond v. Boyles,* 792 F.2d 451 (4th Cir.1986). Neither that case nor *McNabb v. United States Dep't of Educ.,* 862 F.2d 681 (8th Cir.1988), *cert. denied,* — U.S. ——, 110 S.Ct. 55, 107 L.Ed.2d 23 (1989), adds support to appellant's statutory argument.

gation posture of the defendants "is entirely without color and has been asserted wantonly, for purposes of harassment or delay, or for other improper reasons," *Synanon Foundation, Inc. v. Bernstein, supra,* 517 A.2d at 40.[19]

The trial court's finding that RSA's post-litigation actions did not amount to the "extraordinary circumstances" necessary to invoke the bad faith exception is amply supported by the record and applicable authorities. Although a trial court's decision to award or deny attorneys' fees is reviewed for abuse of discretion, *Synanon, supra,* 517 A.2d at 38; *Trilon Plaza Co., supra,* 399 A.2d at 38, the predicate finding of bad faith *vel non* is a factual one which we review under the clearly erroneous standard. D.C.Code § 17–305(a) (1989);[20] *American Federation of State, County and Municipal Employees v. Ball,* 439 A.2d 514, 515 (D.C.1981) (award of attorneys' fees must be affirmed "unless, after addressing the facts underlying the award, we find that the trial court abused its discretion"). *See also Simpson v. Chesapeake & Potomac Tel. Co.,* 522 A.2d 880, 885 (D.C.1987) (trial court's implicit finding under Super.Ct.Civ.R. 11 "that the pleadings were filed in bad faith was not clearly erroneous"); *United Food and Commercial Workers, Local 400 v. Marval Poultry Co.,* 876 F.2d 346, 350–51 (4th Cir.1989); *Bulgo v. Munoz,* 853 F.2d 710, 714 (9th Cir.1988). In *Synanon,* this court imposed a heavy burden on a party alleging that an action has been brought or litigated in bad faith, so as "to avoid penalizing a party for a legitimate exercise of the right of access to the courts," or for maintaining an aggressive litigation posture and asserting all colorable claims or defenses. 517 A.2d at 37.

Appellant did not meet this burden. She argued that RSA's bad faith was shown by its action in barring her attorney from certain meetings where challenged regulations were being discussed, frustrating her discovery requests by requiring her to file a motion to compel release of documents, and attempting to delay the proceedings and bankrupt appellant by submitting "hypertechnical" pleadings.[21] In response, RSA contended that any meetings from which Schlank's attorney had been barred were not open to the public since no official action was being taken at them. Although the trial court ultimately ruled that Schlank's attorney could not be barred from these meetings as an agent and representative of Ms. Schlank, it made no finding that the meetings were indeed public or that RSA's position was unreasonable or asserted in bad faith. With regard to the motion to compel discovery, RSA noted that the motion had been withdrawn shortly after being filed when the requested documents were produced. Lastly, concerning the argument that the pleadings were hypertechnical, the trial court made no finding that any of appellee's positions were groundless or asserted for the purpose of delay. All told, the trial court could properly find, as she did, that RSA's actions amounted to an aggressive litigation strategy but not the bad faith and deliberate oppressiveness necessary to satisfy the equitable exception.

Somewhat more troubling is Schlank's argument that attorneys' fees were justified by RSA's obdurate and dilatory conduct at the administrative level when she

**19.** The court noted that this language from *Synanon* referred to the test for determining whether a suit has been *initiated* in bad faith, but found no reason why the same test should not apply in determining whether the suit was *later litigated* in bad faith.

**20.** "Generally, the factual record must be capable of supporting the determination reached by the trial court" in exercising its discretion. *Johnson v. United States,* 398 A.2d 354, 364 (D.C. 1979).

**21.** Appellant refers in the latter connection to RSA's argument before Judge Wagner that appellant had failed to name the proper parties in her complaint. Although the claims were mainly for injunctive relief against District of Columbia officials in their official capacities, Schlank had identified the parties only by title without identifying them by name. The trial court concluded that "to the extent the official office holders involved must be identified by name as well as by title, amendment to clarify the identities of the parties is appropriate," and that such an amendment would not be prejudicial to the defendants.

repeatedly, and unsuccessfully, sought to reconcile her differences with the agency informally. Judge Kessler found that Schlank had been "trying for ten years to obtain permission from the District of Columbia bureaucracy to service vending machines in the State Department," and that even after she had prevailed on "several significant legal issues" before Judge Wagner, she was still "meet[ing] with delay, foot dragging, and roadblocks from the District Government."[22] Nevertheless, the judge was unable to conclude that appellant's allegations met the "necessarily stringent" standards of the bad faith exception. *Synanon, supra*, 517 A.2d at 28. Mindful of our limited scope of review of this factual determination, we must affirm it as well.

There is debate among the federal courts over whether the bad faith exception applies to *pre*-litigation conduct. *Compare*, for example, *Skehan v. Board of Trustees of Bloomsburg State College*, 538 F.2d 53, 57–58 (3d Cir.) (en banc), *cert. denied*, 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 588 (1976), *with Shimman v. International Union of Operating Engineers Local 18*, 744 F.2d 1226 (6th Cir.1984) (en banc), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985).[23] In *Synanon*, this court pointed out that "the bad faith exception is intended to punish those who have abused *the judicial process* and to deter those who would do so in the future." 517 A.2d at 37 (emphasis added). On the other hand, in *Andrews v. District of Columbia, supra*, we cited several cases for the principle that "an award of attorneys' fees is warranted '[w]here an individual is *forced to seek* judicial assistance to secure a clearly defined and established right, which should have been freely enjoyed without such intervention....'" 443 A.2d at 569 (emphasis added), quoting *Harkeem v. Adams*, 117 N.H. 687, 691, 377 A.2d 617,

619 (1977). *See also Cahn v. Antioch University*, 482 A.2d 120, 133 (D.C.1984) (fees appropriate "where a party ... withholds action to which the opposing party is patently entitled, as by virtue of a judgment or because of a fiduciary relationship, and does so in bad faith"). We shall assume, without deciding, that on a proper showing appellant would have been entitled to attorneys' fees for the pre-litigation conduct of RSA.

Schlank argues that the agency's conduct in resisting her effort to incorporate and in threatening her with license revocation if she did so met the necessary standard. She points to a series of letters from the Regional Commissioner of DOE to RSA in which, after originally stating that the Randolph–Sheppard legislation did not encourage or provide for incorporation, he changed his mind and twice stated that the Act did not prohibit that form of doing business. We agree with appellant that the agency had little practical justification for warning her against incorporation in light of these letters, but we cannot say that her right to incorporate in accordance with the Act was "clearly defined and established" when the agency adhered to its contrary position.[24] Certainly it was not clear "by virtue of a judgment," *Cahn, supra; see Harkeem v. Adams, supra* (agency determination of ineligibility for unemployment benefits overturned by court; agency thereafter "used the same [rejected] rationale to disqualify the appellant from benefits"); *Shull v. Columbus Municipal Separate School Dist.*, 338 F.Supp. 1376 (N.D.Miss.1972) (also cited in *Andrews, supra* ) (school board denied admission to unwed mother despite fact court had twice held that policy unconstitutional). Nor can we say that RSA's adoption of new criteria for vendors wishing to service vending machines—which appellant asserts was directed "with surgical precision" at

---

**22.** *See* Memorandum–Order of January 14, 1988, at 1.

**23.** In part, the debate is over how much can be read into the Supreme Court's statement in *Hall v. Cole*, 412 U.S. 1, 15, 93 S.Ct. 1943, 1951, 36 L.Ed.2d 702 (1973), that "bad faith may be found not only in the actions that led to the

lawsuit, but also in the conduct of the litigation."

**24.** RSA's concern apparently was that allowing a vendor to be licensed and to subcontract to a corporation could adversely affect RSA's collection of the administrative levy and its ability to ensure compliance with the terms of the license.

herself and the only other State Department vendor—compels a conclusion that the agency was motivated by an intent to punish her for past assertion of her rights. In granting partial summary judgment for Schlank, Judge Wagner specifically reserved for trial the "factual dispute as to the reason plaintiff had been denied the request to service vending machines," noting that RSA contended there were other reasons besides the new criteria why it was necessary to deny plaintiff's application. The issue was never tried, however, because in August 1988 the parties jointly moved for entry of final judgment, asserting that RSA had agreed to submit to the U.S. General Services Administration on plaintiff's behalf a request to permit her to service vending machines in the State Department. Thus, the issue of whether RSA had valid, non-pretextual reasons for originally resisting appellant's request was mooted by the parties' consent. In these circumstances Judge Kessler cannot be faulted for finding that the obstacles the agency had placed in the way of Schlank's effort to obtain the servicing right were not retaliatory and evidence of bad faith.

\* \* \* \* \* \*

Ms. Schlank has fought aggressively over the years to obtain what she believed she was entitled to under the Act. In large measure she has been successful. It is also fair to infer that, along the way, she has been felt as a thorn in the side by the bureaucracy, which in turn has not responded with alacrity to her requests. Nevertheless, although the trial court correctly applauded what appellant's counsel terms her indomitable spirit, we conclude that we may not relax either the bad faith exception or the limits on appellate review in this context to charge the government with her legal expenses and so provide a recompense which Congress has seen fit to withhold.

Accordingly, the judgment and order of the Superior Court are

*Affirmed.*